IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON/GREENWOOD DIVISION

| | | |
|---|---|---|
| Antonia Koutrakos, | ) | Civil Action No.  8:13-cv-00883-JMC-JDA |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **REPORT AND RECOMMENDATION** |
| | ) | **OF MAGISTRATE JUDGE** |
| Carolyn W. Colvin, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Civil Rule 73.02(B)(2)(a), D.S.C.  Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) to obtain judicial review of a final decision of Defendant Commissioner of Social Security ("the Commissioner"), denying Plaintiff's claims for disability insurance benefits ("DIB").  For the reasons set forth below, it is recommended that the decision of the Commissioner be AFFIRMED.

## PROCEDURAL HISTORY

On December 21, 2009, Plaintiff filed an application for DIB alleging an onset of disability date of June 15, 2005. [R. 110–16.] Plaintiff's claims were denied initially on April 23, 2010 [R. 61–65], and on reconsideration on August 20, 2010 [R. 69–71] by the Social Security Administration ("the Administration").  Plaintiff requested a hearing before an administrative law judge ("ALJ") and on November 23, 2011, ALJ William F. Pope conducted a de novo hearing on Plaintiff's claims.  [R. 27–58.]

The ALJ issued a decision on January 12, 2012, finding Plaintiff not disabled under the Social Security Act ("the Act"). [R. 14–23.] At Step 1,[1] the ALJ found Plaintiff met the insured status requirements of the Act through December 31, 2009, and she had not engaged in substantial gainful activity during the period from her amended alleged onset date of September 11, 2008,[2] through her date last insured ("DLI") of December 31, 2009. [R. 16, Findings 1 & 2.]  At Step 2, the ALJ found Plaintiff had the following severe impairments: obesity, obstructive sleep apnea, and arthritis of the lumbar spine and knees. [R. 16, Finding 3.] The ALJ also determined Plaintiff had the following non-severe impairments: hypothyroidism, hyperlipidema, hypertension, borderline diabetes mellitus, scoliosis, and atrial ectopy.  [R. 18.]  At Step 3, the ALJ determined Plaintiff did not have an impairment or combination of impairments that met or medically equaled the criteria of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  [R. 18–19, Finding 4.]

Before addressing Step 4, Plaintiff's ability to perform her past relevant work, the ALJ found Plaintiff retained the following residual functional capacity ("RFC"):

> After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except for work requiring lifting or carrying more than 20 pounds; lifting or carrying of 11 to 20 pounds more than occasionally; lifting or carrying of 10 pounds or less more than frequently; standing and/or walking more than 4 hours in an 8 hour workday; kneeling; crawling; climbing of ladders or scaffolds; exposure to dust, fumes, gases, odors, extremes of

---

[1]The five-step sequential analysis used to evaluate disability claims is discussed in the Applicable Law section, *infra*.

[2]  *See*, R. 109 (date amended based on visit to Dr. Sinha (Exhibit 12F)).

temperature or humidity, unprotected heights, or dangerous machinery with exposed moving parts; or more than occasional stooping, twisting, crouching, climbing of stairs or ramps, or operation of foot pedals or other controls with either lower extremity.

[R. 19, Finding 5.] Based on this RFC, at Step 4, the ALJ determined Plaintiff was unable to perform her past relevant work as a cook. [R. 21, Finding 6.] Considering Plaintiff's age, education, work experience, and RFC, however, the ALJ determined that there are jobs that existed in significant numbers in the national economy that Plaintiff could perform. [R. 21–22, Finding 10.] Accordingly, the ALJ concluded Plaintiff had not been under a disability, as defined by the Act, at any time from June 15, 2005[3], the alleged onset date, through December 31, 2009, the date last insured. [R. 22, Finding 11.]

Plaintiff requested Appeals Council review of the ALJ's decision, but the Council declined review. [R. 1–5.] Plaintiff filed this action for judicial review on April 3, 2013. [Doc. 1.]

## THE PARTIES' POSITIONS

Plaintiff contends the ALJ's decision is not supported by substantial evidence and claims the ALJ erred by

(1)    failing to properly assess the opinions of Plaintiff's treating physicians [Doc. 9 at 19–29];

(2)    failing to properly evaluate the credibility of Plaintiff [*id.* at 29–35]; and

(3)    failing to properly assess Plaintiff's RFC from the amended alleged onset date through the DLI [*id.* at 35–37].

---

[3] The date June 15, 2005, is a typo because the ALJ's entire decision discusses whether Plaintiff was disabled beginning September 11, 2008 (the amended alleged onset date). [R. 14–23.]

3

The Commissioner, on the other hand, contends the ALJ's decision is supported by substantial evidence because the ALJ

(1)     properly considered Dr. Chavez's (a treating physician) opinion and Dr. El-Ibiary's opinion [Doc. 10 at 7–11];

(2)     properly evaluated Plaintiff's credibility [*id.* at 11–14]; and,

(3)     correctly determined Plaintiff's RFC [*id.* at 14–15].

Accordingly, the Commissioner requests that the Court affirm the ALJ's decision.  [*Id.* at 16.]

## STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla—i.e., the evidence must do more than merely create a suspicion of the existence of a fact and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citing *Woolridge v. Celebrezze*, 214 F. Supp. 686, 687 (S.D.W. Va. 1963))("Substantial evidence, it has been held, is evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'").

Where conflicting evidence "allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the

4

[Commissioner's] designate, the ALJ)," not on the reviewing court. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996); *see also Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991) (stating that where the Commissioner's decision is supported by substantial evidence, the court will affirm, even if the reviewer would have reached a contrary result as finder of fact and even if the reviewer finds that the evidence preponderates against the Commissioner's decision). Thus, it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment for that of the Commissioner so long as the decision is supported by substantial evidence. *See Bird v. Comm'r*, 699 F.3d 337, 340 (4th Cir. 2012); *Laws*, 368 F.2d at 642; *Snyder v. Ribicoff*, 307 F.2d 518, 520 (4th Cir. 1962).

The reviewing court will reverse the Commissioner's decision on plenary review, however, if the decision applies incorrect law or fails to provide the court with sufficient reasoning to determine that the Commissioner properly applied the law. *Myers v. Califano*, 611 F.2d 980, 982 (4th Cir. 1980); *see also Keeton v. Dep't of Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994). Where the Commissioner's decision "is in clear disregard of the overwhelming weight of the evidence, Congress has empowered the courts to modify or reverse the [Commissioner's] decision 'with or without remanding the cause for a rehearing.'" *Vitek v. Finch*, 438 F.2d 1157, 1158 (4th Cir. 1971) (quoting 42 U.S.C. § 405(g)). Remand is unnecessary where "the record does not contain substantial evidence to support a decision denying coverage under the correct legal standard and when reopening the record for more evidence would serve no purpose." *Breeden v. Weinberger*, 493 F.2d 1002, 1012 (4th Cir. 1974).

The court may remand a case to the Commissioner for a rehearing under sentence four or sentence six of 42 U.S.C. § 405(g). *Sargent v. Sullivan*, 941 F.2d 1207 (4th Cir. 1991) (unpublished table decision). To remand under sentence four, the reviewing court must find either that the Commissioner's decision is not supported by substantial evidence or that the Commissioner incorrectly applied the law relevant to the disability claim. *See, e.g.*, *Jackson v. Chater*, 99 F.3d 1086, 1090–91 (11th Cir. 1996) (holding remand was appropriate where the ALJ failed to develop a full and fair record of the claimant's residual functional capacity); *Brehem v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980) (holding remand was appropriate where record was insufficient to affirm but was also insufficient for court to find the claimant disabled). Where the court cannot discern the basis for the Commissioner's decision, a remand under sentence four is usually the proper course to allow the Commissioner to explain the basis for the decision or for additional investigation. *See Radford v. Comm'r*, 734 F.3d 288, 295 (4th Cir. 2013) (quoting *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985); *see also Smith v. Heckler*, 782 F.2d 1176, 1181–82 (4th Cir. 1986) (remanding case where decision of ALJ contained "a gap in its reasoning" because ALJ did not say he was discounting testimony or why); *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984) (remanding case where neither the ALJ nor the Appeals Council indicated the weight given to relevant evidence). On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence. *See Smith*, 782 F.2d at 1182 ("The [Commissioner] and the claimant may produce further evidence on remand."). After a remand under sentence four, the court enters a final and immediately appealable judgment and then loses jurisdiction. *Sargent*, 941 F.2d 1207 (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 102 (1991)).

6

In contrast, sentence six provides:

> The court may . . . at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding . . . .

42 U.S.C. § 405(g).  A reviewing court may remand a case to the Commissioner on the basis of new evidence only if four prerequisites are met: (1) the evidence is relevant to the determination of disability at the time the application was first filed; (2) the evidence is material to the extent that the Commissioner's decision might reasonably have been different had the new evidence been before him; (3) there is good cause for the claimant's failure to submit the evidence when the claim was before the Commissioner; and (4) the claimant made at least a general showing of the nature of the new evidence to the reviewing court. *Borders v. Heckler*, 777 F.2d 954, 955 (4th Cir. 1985) (citing 42 U.S.C. § 405(g); *Mitchell v. Schweiker*, 699 F.2d 185, 188 (4th Cir. 1983); *Sims v. Harris*, 631 F.2d 26, 28 (4th Cir. 1980); *King v. Califano*, 599 F.2d 597, 599 (4th Cir. 1979)), *superseded by amendment to statute*, 42 U.S.C. § 405(g), *as recognized in Wilkins v. Sec'y, Dep't of Health & Human Servs.*, 925 F.2d 769, 774 (4th Cir. 1991).[4]  With remand under sentence six, the parties must return to the court after remand to file modified findings of fact. *Melkonyan*, 501 U.S. at 98.  The reviewing court retains jurisdiction pending remand and

---

[4]Though the court in *Wilkins* indicated in a parenthetical that the four-part test set forth in *Borders* had been superseded by an amendment to 42 U.S.C. § 405(g), courts in the Fourth Circuit have continued to cite the requirements outlined in *Borders* when evaluating a claim for remand based on new evidence.  *See, e.g.*, *Brooks v. Astrue*, No. 6:10-cv-152, 2010 WL 5478648, at *8 (D.S.C. Nov. 23, 2010); *Ashton v. Astrue*, No. TMD 09-1107, 2010 WL 3199345, at *3 (D. Md. Aug. 12, 2010); *Washington v. Comm'r of Soc. Sec.*, No. 2:08-cv-93, 2009 WL 86737, at *5 (E.D. Va. Jan. 13, 2009); *Brock v. Sec'y of Health & Human Servs.*, 807 F. Supp. 1248, 1250 n.3 (S.D.W. Va. 1992).  Further, the Supreme Court of the United States has not suggested *Borders*' construction of § 405(g) is incorrect.  *See Sullivan v. Finkelstein*, 496 U.S. 617, 626 n.6 (1990). Accordingly, the Court will apply the more stringent *Borders* inquiry.

7

does not enter a final judgment until after the completion of remand proceedings.  *See*

*Allen v. Chater*, 67 F.3d 293 (4th Cir. 1995) (unpublished table decision) (holding that an

order remanding a claim for Social Security benefits pursuant to sentence six of 42 U.S.C.

§ 405(g) is not a final order).

## APPLICABLE LAW

The Act provides that disability benefits shall be available to those persons insured

for benefits, who are not of retirement age, who properly apply, and who are under a

disability.  42 U.S.C. § 423(a).  "Disability" is defined as:

> the inability to engage in any substantial gainful activity by
> reason of any medically determinable physical or mental
> impairment which can be expected to result in death or which
> has lasted or can be expected to last for a continuous period
> of not less than 12 consecutive months.

*Id.* § 423(d)(1)(A).

## I.    The Five Step Evaluation

To facilitate uniform and efficient processing of disability claims, federal regulations

have reduced the statutory definition of disability to a series of five sequential questions.

*See, e.g.*, *Heckler v. Campbell*, 461 U.S. 458, 461 n.2 (1983) (noting a "need for efficiency"

in considering disability claims).  The ALJ must consider whether (1) the claimant is

engaged in substantial gainful activity; (2) the claimant has a severe impairment; (3) the

impairment meets or equals an impairment included in the Administration's Official Listings

of Impairments found at 20 C.F.R. Pt. 404, Subpt. P, App. 1; (4) the impairment prevents

the claimant from performing past relevant work; and (5) the impairment prevents the

claimant from having substantial gainful employment.  20 C.F.R. § 404.1520.  Through the

fourth step, the burden of production and proof is on the claimant.  *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).  The claimant must prove disability on or before the last day of her insured status to receive disability benefits.  *Everett v. Sec'y of Health, Educ. & Welfare*, 412 F.2d 842, 843 (4th Cir. 1969).  If the inquiry reaches step five, the burden shifts to the Commissioner to produce evidence that other jobs exist in the national economy that the claimant can perform, considering the claimant's age, education, and work experience.  *Grant*, 699 F.2d at 191.  If at any step of the evaluation the ALJ can find an individual is disabled or not disabled, further inquiry is unnecessary.  20 C.F.R. § 404.1520(a); *Hall v. Harris*, 658 F.2d 260, 264 (4th Cir. 1981).

### A.    *Substantial Gainful Activity*

"Substantial gainful activity" must be both substantial—involves doing significant physical or mental activities, 20 C.F.R. § 404.1572(a)—and gainful—done for pay or profit, whether or not a profit is realized, *id.* § 404.1572(b).  If an individual has earnings from employment or self-employment above a specific level set out in the regulations, he is generally presumed to be able to engage in substantial gainful activity.  *Id.* §§ 404.1574–.1575.

### B.    *Severe Impairment*

An impairment is "severe" if it significantly limits an individual's ability to perform basic work activities.  *See id.* § 404.1521.  When determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments.  42 U.S.C. § 423(d)(2)(B).  The ALJ must evaluate a

disability claimant as a whole person and not in the abstract, having several hypothetical and isolated illnesses. *Walker v. Bowen*, 889 F.2d 47, 49–50 (4th Cir. 1989) (stating that, when evaluating the effect of a number of impairments on a disability claimant, "the [Commissioner] must consider the combined effect of a claimant's impairments and not fragmentize them"). Accordingly, the ALJ must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled. *Id.* at 50 ("As a corollary to this rule, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments."). If the ALJ finds a combination of impairments to be severe, "the combined impact of the impairments shall be considered throughout the disability determination process." 42 U.S.C. § 423(d)(2)(B).

**C.    *Meets or Equals an Impairment Listed in the Listings of Impairments***

If a claimant's impairment or combination of impairments meets or medically equals the criteria of a listing found at 20 C.F.R. Pt. 404, Subpt. P, App.1 and meets the duration requirement found at 20 C.F.R. § 404.1509, the ALJ will find the claimant disabled without considering the claimant's age, education, and work experience. 20 C.F.R. § 404.1520(d).

**D.    *Past Relevant Work***

The assessment of a claimant's ability to perform past relevant work "reflect[s] the statute's focus on the functional capacity retained by the claimant." *Pass v. Chater*, 65 F.3d 1200, 1204 (4th Cir. 1995). At this step of the evaluation, the ALJ compares the

claimant's residual functional capacity[5] with the physical and mental demands of the kind of work he has done in the past to determine whether the claimant has the residual functional capacity to do his past work.  20 C.F.R. § 404.1560(b).

### E.    *Other Work*

As previously stated, once the ALJ finds that a claimant cannot return to her prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the national economy.  *See Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992); 20 C.F.R. § 404.1520(f)–(g).   To meet this burden, the Commissioner may sometimes rely exclusively on the Medical-Vocational Guidelines (the "grids").  Exclusive reliance on the "grids" is appropriate where the claimant suffers primarily from an exertional impairment, without significant nonexertional factors.[6]  20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(e); *see also Gory v. Schweiker*, 712 F.2d 929, 930–31 (4th Cir. 1983) (stating that exclusive reliance on the grids is appropriate in cases involving exertional limitations).   When a claimant suffers from both exertional and nonexertional limitations, the grids may serve only as guidelines.  *Gory*, 712 F.2d at 931.  In such a case, the Commissioner must use a vocational expert to establish the claimant's ability to perform other work.  20 C.F.R. § 404.1569a; *see Walker*, 889 F.2d at 49–50 ("Because we have

---

[5]Residual functional capacity is "the most [a claimant] can still do despite [his] limitations."  20 C.F.R. § 404.1545(a).

[6]An exertional limitation is one that affects the claimant's ability to meet the strength requirements of jobs.  20 C.F.R. § 404.1569a(a).  A nonexertional limitation is one that affects the ability to meet the demands of the job other than the strength demands.  *Id.*  Examples of nonexertional limitations include but are not limited to difficulty functioning because of being nervous, anxious, or depressed; difficulty maintaining attention or concentrating; difficulty understanding or remembering detailed instructions; difficulty seeing or hearing. § 404.1569a(c)(1).

11

found that the grids cannot be relied upon to show conclusively that claimant is not disabled, when the case is remanded it will be incumbent upon the [Commissioner] to prove by expert vocational testimony that despite the combination of exertional and nonexertional impairments, the claimant retains the ability to perform specific jobs which exist in the national economy.").  The purpose of using a vocational expert is "to assist the ALJ in determining whether there is work available in the national economy which this particular claimant can perform."  *Walker*, 889 F.2d at 50.  For the vocational expert's testimony to be relevant, "it must be based upon a consideration of all other evidence in the record, . . . and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments."  *Id.* (citations omitted).

## II.    Developing the Record

The ALJ has a duty to fully and fairly develop the record.  *See Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986).  The ALJ is required to inquire fully into each relevant issue.  *Snyder*, 307 F.2d at 520.  The performance of this duty is particularly important when a claimant appears without counsel.  *Marsh v. Harris*, 632 F.2d 296, 299 (4th Cir. 1980).  In such circumstances, "the ALJ should scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts, . . . being especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited."  *Id.* (internal quotations and citations omitted).

### III.     Treating Physicians

If a treating physician's opinion on the nature and severity of a claimant's impairments is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record, the ALJ must give it controlling weight.  20 C.F.R. § 404.1527(c)(2); *see Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001).  The ALJ may discount a treating physician's opinion if it is unsupported or inconsistent with other evidence, i.e., when the treating physician's opinion does not warrant controlling weight, *Craig*, 76 F.3d at 590, but the ALJ must nevertheless assign a weight to the medical opinion based on the 1) length of the treatment relationship and the frequency of examination; 2) nature and extent of the treatment relationship; 3) supportability of the opinion; 4) consistency of the opinion with the record a whole; 5) specialization of the physician; and 6) other factors which tend to support or contradict the opinion, 20 C.F.R. § 404.1527(c).  Similarly, where a treating physician has merely made conclusory statements, the ALJ may afford the opinion such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. *See Craig*, 76 F.3d at 590 (holding there was sufficient evidence for the ALJ to reject the treating physician's conclusory opinion where the record contained contradictory evidence).

In any instance, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion.  *See Mitchell v. Schweiker*, 699 F.2d 185, 187 (4th Cir. 1983) (stating that treating physician's opinion must be accorded great weight because "it reflects an expert judgment based on a continuing observation of the patient's condition

for a prolonged period of time"); 20 C.F.R. § 404.1527(c)(2).  An ALJ determination coming down on the side of a non-examining, non-treating physician's opinion can stand only if the medical testimony of examining and treating physicians goes both ways.  *Smith v. Schweiker*, 795 F.2d 343, 346 (4th Cir. 1986).  Further, the ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled.  20 C.F.R. § 404.1527(d).  However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability.  *Id.*

## IV.     Medical Tests and Examinations

The ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is disabled.  20 C.F.R. § 404.1517; *see also Conley v. Bowen*, 781 F.2d 143, 146 (8th Cir. 1986).  The regulations are clear: a consultative examination is not required when there is sufficient medical evidence to make a determination on a claimant's disability.  20 C.F.R. § 404.1517.  Under the regulations, however, the ALJ may determine that a consultative examination or other medical tests are necessary.  *Id.*

## V.     Pain

Congress has determined that a claimant will not be considered disabled unless he furnishes medical and other evidence (e.g., medical signs and laboratory findings) showing the existence of a medical impairment that could reasonably be expected to produce the

14

pain or symptoms alleged. 42 U.S.C. § 423(d)(5)(A). In evaluating claims of disabling pain, the ALJ must proceed in a two-part analysis. *Morgan v. Barnhart,* 142 F. App'x 716, 723 (4th Cir. 2005) (unpublished opinion). First, "the ALJ must determine whether the claimant has produced medical evidence of a 'medically determinable impairment which could reasonably be expected to produce . . . the actual pain, in the amount and degree, alleged by the claimant.'" *Id.* (quoting *Craig*, 76 F.3d at 594). Second, "if, and only if, the ALJ finds that the claimant has produced such evidence, the ALJ must then determine, as a matter of fact, whether the claimant's underlying impairment *actually* causes her alleged pain." *Id.* (emphasis in original) (citing *Craig*, 76 F.3d at 595).

Under the "pain rule" applicable within the United States Court of Appeals for the Fourth Circuit, it is well established that "subjective complaints of pain and physical discomfort could give rise to a finding of total disability, even when those complaints [a]re not supported fully by objective observable signs." *Coffman v. Bowen*, 829 F.2d 514, 518 (4th Cir. 1987) (citing *Hicks v. Heckler*, 756 F.2d 1022, 1023 (4th Cir. 1985)). The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence. 20 C.F.R. § 404.1528. Indeed, the Fourth Circuit has rejected a rule which would require the claimant to demonstrate objective evidence of the pain itself, *Jenkins v. Sullivan*, 906 F.2d 107, 108 (4th Cir. 1990), and ordered the Commissioner to promulgate and distribute to all administrative law judges within the circuit a policy stating Fourth Circuit law on the subject of pain as a disabling condition, *Hyatt v.*

*Sullivan*, 899 F.2d 329, 336–37 (4th Cir. 1990). The Commissioner thereafter issued the following "Policy Interpretation Ruling":

> This Ruling supersedes, only in states within the Fourth Circuit (North Carolina, South Carolina, Maryland, Virginia and West Virginia), Social Security Ruling (SSR) 88-13, Titles II and XVI: Evaluation of Pain and Other Symptoms:
>
> ...
>
> **FOURTH CIRCUIT STANDARD:** Once an underlying physical or [m]ental impairment that could reasonably be expected to cause pain is shown by medically acceptable objective evidence, such as clinical or laboratory diagnostic techniques, the adjudicator must evaluate the disabling effects of a disability claimant's pain, even though its intensity or severity is shown only by subjective evidence. If an underlying impairment capable of causing pain is shown, subjective evidence of the pain, its intensity or degree can, by itself, support a finding of disability. Objective medical evidence of pain, its intensity or degree (i.e., manifestations of the functional effects of pain such as deteriorating nerve or muscle tissue, muscle spasm, or sensory or motor disruption), if available, should be obtained and considered. Because pain is not readily susceptible of objective proof, however, the absence of objective medical evidence of the intensity, severity, degree or functional effect of pain is not determinative.

SSR 90-1p, 55 Fed. Reg. 31,898-02, at 31,899 (Aug. 6, 1990). SSR 90-1p has since been superseded by SSR 96-7p, which is consistent with SSR 90-1p. *See* SSR 96-7p, 61 Fed. Reg. 34,483-01 (July 2, 1996). SSR 96-7p provides, "If an individual's statements about pain or other symptoms are not substantiated by the objective medical evidence, the adjudicator must consider all of the evidence in the case record, including any statements by the individual and other persons concerning the individual's symptoms." *Id.* at 34,485; *see also* 20 C.F.R. § 404.1529(c)(1)–(c)(2) (outlining evaluation of pain).

## VI.    Credibility

The ALJ must make a credibility determination based upon all the evidence in the record.  Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding.  *Hammond v. Heckler*, 765 F.2d 424, 426 (4th Cir. 1985).  Although credibility determinations are generally left to the ALJ's discretion, such determinations should not be sustained if they are based on improper criteria.  *Breeden*, 493 F.2d at 1010 ("We recognize that the administrative law judge has the unique advantage of having heard the testimony firsthand, and ordinarily we may not disturb credibility findings that are based on a witness's demeanor.  But administrative findings based on oral testimony are not sacrosanct, and if it appears that credibility determinations are based on improper or irrational criteria they cannot be sustained.").

## APPLICATION AND ANALYSIS

As noted previously, Plaintiff contends the ALJ's decision is not supported by substantial evidence.  She claims the ALJ erred by failing to properly assess the opinions of Plaintiff's treating physicians, failing to properly evaluate the credibility of Plaintiff, and failing to properly assess Plaintiff's RFC from the amended alleged onset date through the DLI.  The Court disagrees.  For the reasons explained herein, it finds the ALJ's decision is supported by substantial evidence, and the ALJ correctly applied the law.

**Brief Medical History**

While the period of time at issue in this application is September 11, 2008, through December 31, 2009, the Court will briefly discuss the relevant medical history provided in

the record regardless of time frame.  The record before the Court shows that Plaintiff began

seeing Dr. Jose Chavez ("Dr. Chavez") on or about June 9, 2005, with complaints of

frequent atrial ectopy, hypothyroidism, obesity, chronic back problems, and allergies.  [R.

272.]  On June 9, 2005, Plaintiff saw Dr. Himaxi Maysuria ("Dr. Maysuria") of the South

Carolina Heart Center ("SCHC") on follow up and reportedly doing very well at the time but

reporting noticed episodes of "a lot of palpitations and skipped beats," no syncope or

presyncope.  [R. 271.]  Dr. Maysuria fitted Plaintiff with a 24-hour Holter and decided to do

an ecochardiogram and Persantine Cardiolite study.  [*Id.*]  On October 10, 2005, Plaintiff

saw Dr. Maysuria on follow up with no complaints of chest pain, a lot of exertional dyspnea,

and a lot of pain in the knees so that she is unable to walk much. [R. 269.]

On February 22, 2006, Plaintiff saw Dr. Maysuria with complaints of back pain, knee

pain, and an inability to lose weight despite multiple weight loss programs. [R. 267.]  Dr.

Maysuria noted that Plaintiff's insurance denied her gastric bypass surgery although she

needed it for medical reasons.  [*Id.*]  Dr. Maysuria noted that Plaintiff needed to undergo

an exercise Cardiolite study, but that she was unable to exercise and did not want to

pursue the Persantine. [R. 267–68.]  Dr. Maysuria then ordered a CT of the coronary

arteries and an echocardiogram. [R. 268.] On March 31, 2006, Dr. Maysuria performed the

ecochardiogram and noted no masses, thrombi, vegetations, and no pericardial effusion.

[R. 243.] Dr. Maysuria also noted normal left and right ventrical size; ejection fraction

estimated at 60%; no wall motion abnormalities; structurally normal mitral valve and aortic

valve with no regurgitation; normal pulmonic valve and mild regurgitation; normal tricuspid

valve with no regurgitation; and no pulmonary hypertension.  [R. 265.]  However, Dr.

Maysuria noted mild concentric left ventricular hypertrophy and moderately elevated pulmonary artery systolic pressure. [R. 266.]

On May 3, 2006, Plaintiff returned to SCHC on follow up. [R. 262.] Notes from this visit indicate Plaintiff is "finding it increasingly difficult to do even activities of daily living and definitely finding it extremely difficult to even do her regular housework" due to her weight. [*Id.*] Dr. Maysuria noted that Plaintiff "definitely needs to undergo gastric bypass surgery, as this is significantly turning out to be a very high risk for her, with a significant decrease in mobility and her functional status has definitely deteriorated since I am seeing her." [*Id.*] On August 1, 2006, Plaintiff returned to SCHC on follow up on her complaints of palpitations and for sleep apnea. [R. 261.] Notes from this visit indicate Plaintiff experienced a significant decrease in her heart palpitations after being treated with Toprol XL. [*Id.*] Plaintiff also asked to be cleared for gastric surgery. [*Id.*] On August 28, 2006, Plaintiff returned on follow up to SCHC. [R. 258.] Dr. Maysuria noted Plaintiff needed to undergo gastric bypass surgery as her weight was an increased risk for her with significant decrease with functional status and mobility which is progressively deteriorating, and causing severe mental stress on her as she is unable to do her regular duties around the house. [*Id.*] Dr. Maysuria noted that Plaintiff could certainly undergo gastric bypass surgery from a cardiac standpoint with normal LV systolic function and no evidence of myocardial ischemia on her Persantine Cardiolite study. [*Id.*] Additionally, a nuclear medicine test report from that same visit showed normal ejection fraction of 73%. [R. 260.]    On January 2, 2007, Plaintiff visited Dr. Kaushal Sinha ("Dr. Sinha") at Sinha Orthopedics after having twisted her ankle and was advised to use a cam walker and to keep her ankle elevated. [R. 457.] By January 30, 2007, Plaintiff's ankle was much better with minimal tenderness. [R. 458.] On

March 15, 2007, Plaintiff was seen at the SCHC by Dr. Maysuria for her morbid obesity, frequent atrial ectopy (controlled by Toprol), chronic back pain, spinal arthritis, arthritis in both knees, secondary to morbid obesity, hypothyroidism, allergies, and obstructive sleep apnea. [R. 256.] Because she was making improvement and losing weight, Plaintiff indicated gastric bypass surgery was not an option at the time; her main concern was getting the issue of CPAP straightened out. [*Id.*]

On May 3, 2007, Plaintiff was referred by Dr. Chavez to Dr. Jorge Galan, DO("Dr. Galan") at Columbia Gastroenterology Associates for several gastrointestinal ("GI") complaints, predominately epigastric discomfort described as a burning sensation with some regurgitation and, on one or two occasions, vomiting. [R. 179.] Plaintiff reports that her symptoms have been present for years but became worse after being placed on Diclofenac several years ago for chronic knee pain, secondary to arthritis. [*Id.*] On physical exam, Dr. Galan noted that Plaintiff was morbidly obese, had no gross joint deformities or peripheral edema, and had no motor or sensory deficits. [R. 180.] Dr. Galan noted that Plaintiff's morbid obesity was certainly contributing to some of her GI complaints and that her family history of gastric cancer may be contributing as well. [*Id.*] On June 21, 2007, Plaintiff returned to Dr. Galan for a follow-up visit after completing a course of Prevpac for 14 days. [R. 182.] Plaintiff still had some mild epigastric discomfort, especially if she ate late at night, and experienced some bloating. [*Id.*] Dr. Galan maintained Plaintiff on Prevacid 30 mg daily for the 8 weeks and stressed anti-reflux measures and the avoidance of certain foods. [*Id.*] On May 9, 2007, endoscopist Dr. Galan performed an outpatient EGD on Plaintiff with normal findings and no complications on the upper endoscopy. [R. 183.]

20

On November 5, 2007, Plaintiff presented to the Radiology Department at Lexington Medical Center, on Dr. Chavez's order, for a chest x-ray [R. 219] due to complaints of shortness of breath [R. 222], and a sinus x-ray [R. 220]. The findings from the chest x-ray included some thoracic kyphosis; normal size heart; linear band of scarring over the left hilar region which has remained stable since previous study; and clear lungs with bony thorax intact. [R. 219.] The subsequent chest x-ray on March 14, 2008, noted "[n]o acute process." [R. 222.] The findings from the sinus x-ray were negative with no acute or chronic sinusitis seen. [R. 220.] On November 21, 2007, Plaintiff returned to Dr. Maysuria on follow up with no chest pain but complaining of shortness of breath and back pain. [R. 255.] Dr. Maysuria noted that Plaintiff was stable from a cardiovascular standpoint and that he would see her back in February. [*Id.*]

On February 27, 2008, Plaintiff presented to the SCHC on follow up for her frequent atrial ectopy (noted to be controlled on toprol), chest pain and SOB. [R. 251.] Dr. Maysuria found Plaintiff's respiratory pattern to be non-labored; no rales or rhonchi; and no wheezes. [R. 252.] Plaintiff's echocardiogram from the same date indicates normal heart size and function. [R. 254.] Dr. Maysuria referred Plaintiff to a weight loss program "as she, certainly, needs to lose weight." [R. 253.]

On September 11, 2008, the date Plaintiff alleges her disability began, Plaintiff returned to Dr. Sinha with complaints of right and left knee pain, and pain radiating in her back down to both lower extremities posterolaterally. [R. 459.] At the time, Plaintiff weighed 250 pounds and was told to start a diet, lose weight, and start some type of exercise like swimming or bicycling in a sitting position. [R. 460.] On physical exam, Dr. Sinha found Plaintiff's straight leg raising test were positive at 60 degrees bilaterally; range

of motion of lumbosacral area restricted to minimal degree; no loss of pinprick sensation in any particular dermatome pattern; and no weakness of extensor hallucis longus with good peripheral pulses. [R. 459.] X-rays of the spine showed degenerative disk disease with some thoracolumbar scoliosis, narrowing of the disk spaces, and anterior spurring from vertebral bodies. [*Id.*] X-rays of the knees showed advanced tricompartmental degenerative arthritis of both knees with multiple traction and marginal osteophytes with marked narrowing of joint spaces that includes patellofemoral joint, medial and lateral compartments. [*Id.*] Dr. Sinha assessed chronic low back syndrome secondary to degenerative disk process and possible thoracolumbar left scoliosis and bilateral advanced tricompartmental degenerative arthritis with degenerative tear of menisci or internal derangement. [*Id.*] On October 23, 2008, Plaintiff continued to complain of right knee and back pain and was having difficulty walking and doing activities outside of the house. [R. 461.] Dr. Sinha noted that Plaintiff's pain was so great that it was difficult to find exactly where it was hurting, indicating that her complaints were "quite scattered and vague." [*Id.*] Plaintiff was advised to get a limited bone scan to rule out occult problems. [*Id.*]

On March 4, 2009, Plaintiff presented to the SCHC on follow up for her palpitations and for a review of her nuclear and echo results. [R. 248.] Dr. Maysuria noted that Plaintiff's Persantine Cardiolite study showed no evidence of sichemia and her echocardiogram showed normal ejection fraction. [*Id.*] Dr. Maysuria also found Plaintiff had no cardiac symptoms attributable to valvular heart disease [*id.*]; normal coronary CT angiogram; no acute cardiopulmonary disease; no evidence of myocardial ischemia; and likely mild thoracolumbar scoliosis with minimal thoracic compression deformities. [R. 249.]

On September 9, 2009, Plaintiff presented to the SCHC on follow up for her frequent

atrial ectopy and complaints of moderately severe shortness of breath. [R. 244.] Plaintiff indicated that the "palpatations were not bothering her so much right now." [R. 244.] On physical exam, Dr. Maysuria noted Plaintiff was 5'3", 312 lbs with a BMI of 55.4 with normal maximal impulse, no extra heart sounds and no murmurs. [R. 246.] Dr. Maysuria also noted normal right and left vascular upstrokes; normal right and left femoral and tibial pulses; no clubbing; and mild lower extremity edema in both legs. [*Id.*] Dr. Maysuria indicated that he would see Plaintiff next year with a PET scan for ischemic evaluation because her BMI is above 55 and will check an echo; he also noted she has sleep apnea and uses a CPAP. [R. 244.]

On November 11, 2009, Plaintiff saw Dr. Glen F. Strickland of the SC Obesity Surgery Center for her morbid obesity. [R. 299.] The results of Plaintiff's physical exam produced normal results with the exception of an abnormal finding of ankle edema and pitting bilaterally. [R. 301–02.] Plaintiff was diagnosed with stable hyperlipidemia, stable morbid obesity, stable arthritis, and stable insomnia with sleep apnea. [R. 302.] Plaintiff's treatment plan included counseling and participation in support groups and noted that, because Plaintiff had made multiple good faith attempts at diet and weight loss without satisfactory sustained results, she was a candidate for bariatric surgery. [*Id.*]

On April 19, 2010, four months after Plaintiff's DLI, Plaintiff saw Dr. Maysuria for follow up of PVCs and PACs but with no complaints of significant palpitations. [R. 321.] Treatment notes indicate Plaintiff was being evaluated for dyspnea (shortness of breath) which was aggravated by mild activity and alleviated with rest. [*Id.*] Dr. Maysuria's notes indicate that Plaintiff's Persantine Cardiolite study showed a large anterior breast tissue attenuation defect but no ischemia. [*Id.*] Additionally, Dr. Maysuria noted Plaintiff's ejection

23

fraction was 75% and that she had no symptoms attributable to valvular heart disease and no stroke-like symptoms.  [*Id.*]

On April 21, 2010, Dr. Seham El-Ibiary ("Dr. El-Ibiary") completed a Physical RFC Assessment on Plaintiff and noted that she retained the ability to occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk with normal breaks about 6 hours in an 8-hour workday; sit with normal breaks about 6 hours in an 8-hour work day; and push and/or pull in an unlimited manner  other than as sown for lift and/or carry.  [R. 289–96.]  Dr. El-Ibiary concluded that Plaintiff was restricted to light work.  [R. 290.]  With respect to postural limitations, Dr. El-Ibiary limited Plaintiff to frequent climbing of ramps and stairs; no climbing of ladders/ropes or scaffolds; and occasional balancing, stooping, kneeling, crouching and crawling.  [R. 291.]  Dr. El-Ibiary found Plaintiff had no manipulative, visual, or communicative limitations [R. 292–93], but found that, with respect to environmental limitations, Plaintiff should avoid concentrated exposure to hazards such as machinery and heights.  [R. 293].

On August 10, 2010, almost two years after her alleged disability date and after her DLI, Plaintiff returned to Dr. Sinha complaining of pain in her right heel and left knee, as well as worsening pain in her back.  [R. 462.]  At this visit, Plaintiff's weight had notably increased from 250 pounds [R. 460] to 310 pounds [R. 462].  Dr. Sinha diagnosed Plaintiff with right heel plantar fasciitis and degenerative arthritis in both knees with chondromalacia of patella and medial collateral bursitis; Dr. Sinha treated Plaintiff with an injection to both knees which resulted in her being able to move and walk better.  [*Id.*]

On August 20, 2010, a Medical Evaluation Referral was made to Dr. Heather Howell-Whitlock ("Dr. Howell-Whitlock") who reviewed Plaintiff's medical records from Dr. Chavez dated March 2006 through September 2009 and concluded that

> [b]ased on a preponderance of the medical evidence prior to expired DLI of 12/31/09, cla was noted to have symptoms that were not severe and would not preclude all work activity. It has been taken into consideration the cla's weight at this time. However, despite an elevated weight, symptoms were not severe; therefore, did not preclude work activity. 3p noted that several years ago, cla had good response to CPAP machine to his knowledge and walked better, at that time, and did not require an assistive device in order to ambulate.

[R. 298.]

On October 22, 2010, Plaintiff saw Dr. Maysuria with complaints of shortness of breath with pedal edema. [R. 318.] Dr. Maysuria prescribed Lasix 20 mg and noted that Plaintiff's echo showed normal ejection fraction of 60% with mild concentric left hypertrophy. [*Id.*] Dr. Maysuria's notes also indicate that Plaintiff was denied gastric bypass surgery by her insurance. [*Id.*]

On December 3, 2010, Plaintiff saw Dr. Maysuria on follow up complaining of vague chest discomfort mostly in the right side making her feel uncomfortable with an episode of nausea, and intermittent pain. [R. 315.] Plaintiff's blood sugars were also noted to be poorly controlled. [*Id.*] Because Plaintiff had significant risk factors for coronary artery disease with hyperstension, mild diabetes, obstructive sleep apnea, and morbid obesity, Dr. Maysuria decided to proceed with a left heart catheterization. [*Id.*]

On December 10, 2010, Plaintiff returned to Dr. Maysuria for a review of her catheterization results which indicated "only mild coronary artery disease or not more than 20-30% in the LAD." [R. 312.] Dr. Maysuria found Plaintiff's pulmonary artery pressure

was normal but that her pulmonary capillary wedge pressure and LVEDP were elevated. [*Id.*]  Plaintiff had no chest discomfort, palpitations, syncope or near syncope and denied claudication, TIA or stroke-like symptoms.  [*Id.*]  Dr. Maysuria increased her Lasix to 40mg and added K-Dur 20 mg a day. [*Id.*]  Plaintiff was instructed on a low fat, low sodium, low carbohydrate diet, was given exercise guidelines, and the importance of weight loss and medication compliance was stressed.  [R. 314.]

On April 4, 2011, Plaintiff returned to Dr. Maysuria of the SCHC for a review of labs and on follow up for her atrial and ventricular ectopy.  [R. 309.]  Dr. Maysuria noted that Plaintiff was not having chest pains but that she was experiencing shortness of breath on exertion and edema.  [*Id.*]  He also noted that Plaintiff had no symptoms attributable to valvular heart disease.  [*Id.*]  A review of Plaintiff's systems and findings on physical exam were normal.  [R. 311.]  Plaintiff was instructed on a low fat, low sodium, low carbohydrate diet, was given exercise guidelines, and the importance of weight loss and medication compliance was stressed. [*Id.*]

On May 11, 2011, Plaintiff saw Dr. Paul Kirschenfeld ("Dr. Kirschenfeld") of Carolina Pulmonary and Critical Care ("CPCC") for follow up on her sleep apnea.  [R. 346.]  Dr. Kirschenfeld noted Plaintiff was sleeping well with the auto-adjust BiPAP and was usually able to sleep all night.  [*Id.*]  On physical exam, Dr. Kirschenfeld noted Plaintiff was obese but in no respiratory distress at rest, and that her extremities were without edema.  [*Id.*]

On August 4, 2011, Plaintiff saw Dr. Sinha on follow up from her bone scan of her lower extremities which was conducted at her previous appointment and read by Dr. Beth Siroty-Smith.  [R. 463.]  Results of the bone scan showed increased activities in both knees, relatively stable in appearance in comparison to the limited bone scan done in

October 2008; however, there were some local increased activities involving the posterior right calcaneal and Achilles tendon insertion region.  [*Id.*]  Plaintiff was advised that there was no evidence of stress fracture and that findings were most consistent with degenerative changes in the knees and right heel; that the x-ray of her thoracolumbosacral spine shows mild scoliotic curvature, convex to the left; multiple degenerative disk and facet disease with anterolisthesis at L4-L5 and multi-level disk space height loss with anterior osteophyte formation; and that x-ray of her thoracic area shows mild kyphosis and multiple degenerative disk disease with anterior osteophyte formation.  [*Id.*]  X-rays also showed right convex scoliotic curvature of the thoracic spine and degenerative changes in the cervical spine between the anterior arch of the C1 and the dens and degenerative disk disease at C5-C6, C4-C5.  [*Id.*]  Dr. Sinha noted that no aggressive treatment was indicated at this time and most of all she needed to lose weight.  [*Id.*]

On September 5, 2011, Dr. Chavez completed a *Medical Opinion re: Ability To Do Work Related Activities (Physical)* with respect to his opinion of Plaintiff's ability to work on a day-to-day basis in a regular work setting.  [R. 467–69.]  Dr. Chavez opined Plaintiff was able to lift/carry a maximum of 10 pounds on an occasional and frequent basis; stand/walk and sit for less than 2 hours in a 8-hour day; must alternate sit/stand/walk position every 20 minutes; change position after standing 20 minutes; walk around every 15 minutes; twist and stoop occasionally; and never crouch, climb stairs or climb ladders.  [R. 467–68.]  Dr. Chavez also opined that Plaintiff will need to lie down at work every 3 hours due to her morbid obesity, osteoarthritis of the knees and lumbosacral spine, sleep apnea, hypersholesteral, borderline diabetes, chronic allergies, and hypothyroid.  [*Id.*]  Additionally, Dr. Chavez noted that Plaintiff's ability to reach overhead and push/pull are affected by her

impairment [*id.*] and that she should avoid all exposure to extreme cold and heat; even moderate exposure to wetness and humidity; and concentrated exposure to fumes, odors, dusts, gases, poor ventilation and hazards (machinery, heights, etc.).  [R. 469].

**Treating Physician Opinions**

Plaintiff takes issue with the ALJ's weighing of Dr. Chavez's opinion with respect to Plaintiff's functional capacity.  [*See* Doc. 9 at 22–23.]  Plaintiff argues that the ALJ failed to give proper retrospective consideration to evidence created between six and seven years after Plaintiff's DLI as the evidence could be reflective of earlier and progressive degeneration. [*Id.* at 24.]  Additionally, Plaintiff argues the ALJ improperly failed to include notes from Dr. Sinha from August 2010 [*id.* at 27] and improperly assigned considerable weight to state agency medical consultants.  [*Id.* at 28].

The Commissioner contends the ALJ properly noted that "Dr. Chavez's limitations seemed to apply to Plaintiff's functioning at the time of the opinion in late 2011, not the period of alleged disability ending December 2009 (Tr. 19-20)."  [Doc 10 at 7.]  The Commissioner takes the position that the ALJ correctly found the medical evidence did not support Dr. Chavez's opined limitations [*id.* at 8] and justifiably assigned considerable weight to Dr. El-Ibiary's opinion finding it more consistent with the record evidence.  [*Id.* at 10–11].

The ALJ is obligated to evaluate and weigh medical opinions "pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist."  *Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005) (citing

28

20 C.F.R. § 404.1527).   Courts typically "accord 'greater weight to the testimony of a treating physician' because the treating physician has necessarily examined the applicant and has a treatment relationship with the applicant." *Id.* (quoting *Mastro*, 270 F.3d at 178). While the ALJ may discount a treating physician's opinion if it is unsupported or inconsistent with other evidence, *Craig*, 76 F.3d at 590, the ALJ must still weigh the medical opinion based on the factors listed in 20 C.F.R. § 404.1527(c).

The opinion of a treating physician is given controlling weight only if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. § 404.1527(c)(2).   Additionally, Social Security Ruling ("SSR") 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion:

> [A] finding that a treating source medical opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected.  Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927. In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

1996 WL 374188, at *4 (July 2, 1996).  However, not every opinion offered by a treating source is entitled to deference:

> Medical sources often offer opinions about whether an individual who has applied for title II or title XVI disability benefits is "disabled" or "unable to work," or make similar statements of opinions.  In addition, they sometimes offer opinions in other work-related terms; for example, about an individual's ability to do past relevant work or any other type of work.  Because these are administrative findings that may

29

> determine whether an individual is disabled, they are reserved
> to the Commissioner.  Such opinions on these issues must not
> be disregarded.  However, even when offered by a treating
> source, they can never be entitled to controlling weight or given
> special significance.

SSR 96-5p, 1996 WL 374183, at *5 (July 2, 1996); *see also* 20 C.F.R. §§ 404.1527(e),

416.927(e) (stating an ALJ does not have to "give any special significance to the source

of an opinion on issues reserved to the Commissioner," such as an opinion that the

claimant is disabled, the claimant's impairment or impairments meets or equals a listing,

or the claimant has a certain residual functional capacity).

### ALJ's Treatment of Medical Opinions

With respect to Dr. Chavez's September 2011, opinion indicating Plaintiff retained

the functional capacity for significantly less than the full range of sedentary work activity,

the ALJ noted that "Dr. Chavez's opinion is considered but given significantly less than full

weight for the time period under consideration.  The standing and walking limitations

appear to pertain to the claimant's current status and not the period through December 31,

2009."  [R. 19–20.]  Additionally, the ALJ explained that

> A careful review of Dr. Chavez's progress notes showed he
> never placed any restrictions on the claimant's activities and
> never indicated she was disabled or otherwise unable to work.
> Furthermore, his progress notes document few significant,
> abnormal medical signs, other than the claimant's weight–she
> has repeatedly been instructed to lose weight. Overall, the
> medical evidence of record indicates the claimant's scoliosis is
> mild; her sleep apnea is controllable with AutoAdjust BiP AP;
> her chronic allergic rhinitis and hypothyroidism are controlled
> with medication; and her borderline diabetes was noted in
> November 2009 and has not required treatment with
> medications. Although the medical records establish the
> claimant's osteoarthritis of the lumbosacral spine and knees,
> the asserted severity is not consistently documented by the
> medical records. Dr. Sinha's progress notes from September

and October 2008 establish the impairments; however, after the October 2008 appointment, the claimant did not return to Dr. Sinha until August 2010, nearly two years later, which is subsequent to when the claimant has acknowledged her symptoms worsened. Furthermore, Dr. Chavez's progress notes for the period September 11, 2008, through December 31, 2009, regularly indicated a full range of motion in all extremities, good muscle strength against resistance, and good muscle strength against resistance.

Dr. Chavez's September 2011 opinion is not supported by his own progress notes for that period, nor is it consistent with other then existing medical records of treating, examining, and non-examining physicians. His opinion is also not consistent with the claimant's statements of her deteriorating condition beginning in 2010. Dr. Chavez's September 2011 medical source statement is considered but given little weight for the time period under consideration.

A careful review of the evidence showed that other than Dr. Chavez's opinion discussed above, no physician has imposed restrictions upon the claimant; furthermore, none of those physicians have opined she was disabled or otherwise unable to work. I specifically note that Dr. Sinha, a treating orthopedist, did not restrict the claimant's activities, but said she needed to lose weight and exercise (Exhibit 12F, page 4).

[R. 20.]

With respect to the other opinion evidence of record, the ALJ noted that

In April and August 2010, State Agency medical consultants reviewed the records and assessed the severity of the claimant's impairments for the period ending December 31, 2009. In April, a consultant indicated the claimant retained the capacity to perform a range of work related activities at the light exertional level (Exhibit 5F). In August, another consultant concluded the claimant's physical impairments were nonsevere as of December 31, 2009 (Exhibit 6F). The April assessment is consistent with the then existing medical records and is given considerable, but not controlling, weight for the time period considered. The August assessment does not appear to have considered the claimant's musculoskeletal impairments, and therefore, the assessment is not consistent with the then existing records and is given negligible weight.

[*Id.*]

### *Discussion*

Medical evaluations made after a claimant's insured status has expired are not automatically barred from consideration and may be relevant to prove a disability arising before the claimant's DLI. *Wooldridge v. Bowen*, 816 F.2d 157, 160 (4th Cir.1987). In *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 341 (4th Cir. 2012), the Fourth Circuit held that

> [i]n *Moore*[7], we recognized that evidence created after a claimant's DLI, which permits an inference of linkage between the claimant's post—DLI state of health and her pre—DLI condition, could be the "most cogent proof" of a claimant's pre—DLI disability. *Id.* Accordingly, under our decisions in *Moore* and *Johnson*[8], retrospective consideration of evidence is appropriate when "the record is not so persuasive as to rule out any linkage" of the final condition of the claimant with his earlier symptoms. *Id.*

Accordingly, although Plaintiff must establish the presence of a disability prior to the DLI, medical evidence produced after the DLI is admissible if said evidence "permits an inference of linkage with the claimant's pre-date last insured condition." *Bird*, 699 F.3d at 341. Therefore, based on the Fourth Circuit's decision in *Bird*, the ALJ is to consider the medical evidence established after the DLI as long as "that evidence permits an inference of linkage with the claimant's pre-DLI condition" and the failure to do so constitutes "an error of law." *Id.*

---

[7] *Moore v. Finch*, 418 F.2d 1224 (4th Cir. 1969).

[8] *Johnson v. Barnhart,* 434 F.3d 650 (4th Cir. 2005).

In this case, neither the Plaintiff nor the medical experts have opined or explained how the medical evidence from Dr. Sinha or Dr. Chavez's opinion, both dated after the DLI, relates back to the time period relevant to Plaintiff's disability determination.  First, it is unclear why Dr. Sinha's August 2010 notes, even if considered by the ALJ, would keep Plaintiff from performing light work.  While Plaintiff's bone scan showed issues with her knees and back, Dr. Sinha ultimately determined that no aggressive treatment was indicated and that, most of all, Plaintiff needed to lose weight.[9]  [R. 463.] Additionally, while Dr. Chavez opined regarding Plaintiff's work limitations in September 2011, there is nothing in his opinion that relates these limitations back to the relevant time period.  As the ALJ noted, Dr. Chavez's notes never placed any restrictions on Plaintiff's activities and never indicated she was disabled or otherwise unable to work during the relevant time period. [R. 20.] The ALJ concluded that ["t]he weight of the evidence convincingly showed deterioration after the date the claimant's disability insurance coverage expired, and the deterioration cannot be reasonably related back to the period under consideration." [R. 21.] Thus, due to the lack of evidence linking Plaintiff's pre-DLI condition and the post-DLI opinions, the ALJ was not required to consider the post-DLI evidence and the Court finds no error in the ALJ's failure to do the same.

With respect to Plaintiff's objection to the weight assigned to the state agency medical opinions by the ALJ, the Court finds Plaintiff's arguments unavailing.  "[T]he

---

[9]Plaintiff takes issue with the ALJ's statement that there was no evidence that a bone scan was done. [Doc. 9 at 28.]  The Court notes that, while a bone scan was conducted in 2008, as referenced in the results of the 2011 bone scan, the results of the 2008 bone scan do not appear to be in evidence.  And, while the results of the 2011 bone scan note "increased activities in both knees, relatively stable in appearance in comparison to the limited bone scan done in October 2008," Dr. Sinha continued to suggest "no aggressive treatment" and the need for Plaintiff to lose weight.  [R. 463.]  Accordingly, the Court finds this error harmless.

opinions of State agency medical and psychological consultants . . . can be given weight only insofar as they are supported by evidence in the case record[.]" SSR 96–6P, 1996 WL 374180, at *2 (July 2, 1996). Plaintiff does not contend the opinions are contradicted by evidence of record during the relevant time period. And while Plaintiff takes issue with the failure of these state agency physicians to take into consideration the x-rays of Plaintiff's treating orthopedist Dr. Sinha, there is no evidence of record relating those x-rays (or bone scans) to the relevant time period; and Plaintiff fails to explain how the evidence in these x-rays contradicts the opinions of the state agency physicians.

Upon review the Court finds the ALJ's weighing of the medical evidence is supported by substantial evidence. The law is clear that the Plaintiff bears the burden of proof during the first four steps of the inquiry, while the burden shifts to the Commissioner for the final step. *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995) (*citing Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992)). Plaintiff failed to explain how medical evidence obtained after the DLI relates to the relevant time period; thus, the Court declines to remand on this basis.

**Credibility of Plaintiff**

Plaintiff argues the ALJ failed to comply with SSR 96-7p when finding that the objective medical evidence for the relevant time period did not support the severity alleged by Plaintiff. [Doc. 9 at 31.] Plaintiff contends the ALJ commented on the lack of testimony regarding Plaintiff's activities of daily living but disregarded his obligation to assess her activities in evaluating her credibility. [*Id.* at 32.] Additionally, Plaintiff contends the ALJ failed to include several important factors regarding Plaintiff's obesity (i.e., her numerous attempts to lose weight) and, rather, focuses on physician recommendations to lose weight.

34

[*Id.*]  Lastly, Plaintiff contends the ALJ improperly used Plaintiff's failure to return to her treating orthopedist for two years against her when its not clear the orthopedist was going to be able to provide her any assistance since she was too young for total joint replacement and orthoscopic surgery was not a cure for her problem. [*Id.* at 34.] The Commissioner, on the other hand, notes the ALJ's credibility analysis is supported by substantial evidence. [*See generally*, Doc. 10 at 11–14.]

In considering Plaintiff's testimony regarding her limitations, the ALJ must consider all relevant evidence of record.  *See* SSR 96-7p, 61 Fed. Reg. at 34,485 (whenever a claimant's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the claimant's statements based on a consideration of the entire case record.)  The credibility determination "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."  *Id.*; *see also Hammond*, 765 F.2d at 426 (stating that the ALJ's credibility determination "must refer specifically to the evidence informing the ALJ's conclusions").

The following is a nonexhaustive list of relevant factors the ALJ should consider in evaluating a claimant's symptoms, including pain: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate the symptoms; (5) treatment, other than medication, received to relieve the symptoms; and (6) any measures the claimant has used to relieve the symptoms.  20

C.F.R. § 1529(c)(3).  If the ALJ points to substantial evidence in support of his decision and adequately explains the reasons for his finding on the claimant's credibility, the court must uphold the ALJ's determination.  *Mastro*, 270 F.3d at 176 (holding that the court is not to "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of" the agency).

### *ALJ's Analysis*

In considering Plaintiff's symptoms, the ALJ followed the two-step process of first determining whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's pain or other symptoms and, second, evaluating the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functioning. [R. 19.]   Upon reviewing the objective medical evidence, the ALJ concluded that "the objective medical evidence for the period under consideration does not support the severity alleged by the claimant."  [*Id.*]  The ALJ further reasoned as follows:

> A careful review of Dr. Chavez's progress notes showed he never placed any restrictions on the claimant's activities and never indicated she was disabled or otherwise unable to work. Furthermore, his progress notes document few significant, abnormal medical signs, other than the claimant's weight she has repeatedly been instructed to lose weight. Overall, the medical evidence of record indicates the claimant's scoliosis is mild; her sleep apnea is controllable with AutoAdjust BiP AP; her chronic allergic rhinitis and hypothyroidism are controlled with medication; and her borderline diabetes was noted in November 2009 and has not required treatment with medications. Although the medical records establish the claimant's osteoarthritis of the lumbosacral spine and knees, the asserted severity is not consistently documented by the medical records. Dr. Sinha's progress notes from September and October 2008 establish the impairments; however, after the October 2008 appointment, the claimant did not return to

Dr. Sinha until August 2010, nearly two years later, which is subsequent to when the claimant has acknowledged her symptoms worsened. Furthermore, Dr. Chavez's progress notes for the period September 11, 2008, through December 31, 2009, regularly indicated a full range of motion in all extremities, good muscle strength against resistance, and good muscle strength against resistance.

. . . .

A careful review of the evidence showed that other than Dr. Chavez's opinion discussed above, no physician has imposed restrictions upon the claimant; furthermore, none of those physicians have opined she was disabled or otherwise unable to work. I specifically note that Dr. Sinha, a treating orthopedist, did not restrict the claimant's activities, but said she needed to lose weight and exercise (Exhibit 12F, page 4).

. . . .

The claimant takes several medications for control of her symptoms. Her medication list showed only one anti-inflammatory, pain medication (Diclofenac), which she has been taking for about 10 years (Exhibit (Exhibit 12E). At the hearing, the claimant did not complain of adverse side effects or ineffectiveness of her medication. In addition to her medication, the claimant testified she does the following for relief of her symptoms: lies down, therapy, massages, wear a special shoe (She was not wearing it at the hearing), and sometimes uses a walker for assistance (She was not using a cane or a walker at the hearing).

At the hearing, the claimant provided no testimony regarding her activities of daily living during the period at Issue, nor did she provide much information about her current activities. She stated she could bathe or shower by herself, and beginning about a year earlier, she started needing her husband's assistance dressing.

[R. 20–21.]

### Discussion

37

In evaluating subjective complaints, the United States Court of Appeals for the Fourth Circuit has stated that "the determination of whether a person is disabled by pain or other symptoms is a two-step process." *Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996). In making these determinations, the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96–7p. "[A]llegations concerning the intensity and persistence of pain or other symptoms may not be disregarded solely because they are not substantiated by objective medical evidence." *Id.* (emphasis added). "This is not to say, however, that objective medical evidence and other objective evidence are not crucial to evaluating the intensity and persistence of a claimant's pain and the extent to which it impairs her ability to work." *Craig*, 76 F.3d at 595. A claimant's subjective complaints "need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the [symptoms] the claimant alleges she suffers." *Id.* The ALJ is within bounds to disregard Plaintiff's testimony to the extent it is inconsistent with the objective medical evidence in the record. *See Johnson v. Barnhart*, 434 F.3d 650, 658 (4th Cir. 2005); *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986); *see also Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir. 1994) (noting that the "only fair manner to weigh a subjective complaint is to examine how pain affects the routine of life"). The ALJ's responsibility is to "make credibility determinations—and therefore sometimes must make negative

38

determinations—about allegations of pain or other nonexertional disabilities." *Hammond v. Heckler*, 765 F.2d 424, 426 (4th Cir. 1985).

As stated above, Plaintiff takes issue with the ALJ's failure to inquire into Plaintiff's activities of daily living during the relevant time period, his failure to consider Plaintiff's attempts to lose weight, and the ALJ's reliance on Plaintiff's failure to obtain orthopedic treatment for two years in determining her credibility. The Court notes, however, that Plaintiff fails to explain which limitation(s) was overlooked or disregarded due to these alleged errors. Because Plaintiff's argument appears to be directed to Plaintiff's orthopedic limitations, the Court notes that the ALJ reasonably explained his reasoning for finding Plaintiff limited to light work based on her alleged orthopedic limitations. The ALJ specifically noted that Dr. Sihna, Plaintiff's treating orthopedist, did not restrict the Plaintiff's activities during the relevant time period even in light of her obesity. [R. 20.] *See Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005) (holding the ALJ's adoption of physicians' conclusions, when the physicians were aware of the claimant's "obvious obesity," constituted satisfactory consideration of the claimant's obesity and declining to remand the case because explicitly considering the claimant's obesity would not affect the outcome of the case). Additionally, the Court notes that the state agency examiners, whose opinions the ALJ relied on, noted that Plaintiff's activities of daily living were restricted and still found her capable of performing light work, even in light of her obesity. [*See* R. 290.] In any instance, the burden was on Plaintiff to provide evidence of her limitations, including limitations in her activities of daily living. *See Pass*, 65 F.3d at 1203. Accordingly, the Court declines to remand on this basis.

**RFC Determination**

Plaintiff contends the ALJ failed to properly assess Plaintiff's RFC from the amended alleged onset date through the DLI.  [Doc. 9 at 35.]   Plaintiff disagrees with the ALJ's conclusion that the "weight of the evidence cannot be related back to prior to December 31, 2009."  [*Id.*]  Thus, Plaintiff contends the ALJ's decision does not comply with SSR 86-8 because the ALJ made presumptions and speculations about the date of medical deterioration and failed to clearly explain why the deterioration could not be reasonably related back to the period under consideration.  [*Id.* at 36–37.]

***ALJ's Analysis***

In assessing Plaintiff's RFC, the ALJ noted that while Dr. Chavez found Plaintiff retained an RFC for less than the full range of sedentary work activity, his September 2011 findings do not appear to pertain to Plaintiff's status during the relevant time period.  [R. 19–20.]  The ALJ also noted that Plaintiff's

> testimony and documentary evidence convincingly showed there has been a deterioration in the claimant's conditions subsequent to December 31, 2009. The claimant's testimony regarding her subjective complaints related to the current time frame and not the period at issue. She further stated that for the past year (approximately November 2010), her husband has had to help her dress. In May 2010, the claimant stated it became more difficult to walk in 2010 (Exhibit 6E). In August 2010, the claimant said her knees had deteriorated since May 2010, and she had a bone spur in the right foot. In August 2010, she said she was not able to walk (Exhibit 6E). In August 2010, the claimant's husband stated her condition had worsened over the years, and a few years ago, she was able to walk without assistance (Exhibit 7E). In October 2010, the claimant indicated it became more difficult to stay on her feet and take care of herself beginning in August 2010 (Exhibit l0E).

[R. 17.]  With respect to Plaintiff's impairments during the relevant time period, the ALJ

noted as follows:

> Since at least September 2005, Dr. Jose Chavez has been the claimant's treating general practitioner. Much of Dr. Chavez's treatment of the claimant was for conditions properly categorized as nonsevere (See the last paragraph of this Finding). During the period September 11, 2008, through December 31, 2009, the claimant's weight was regularly in the 300 plus range. He has advised her to lose weight. Dr. Chavez consistently indicated the claimant had a full range of motion in all extremities; had good muscle strength against resistance; and had good muscle tone against resistance. In March 2009, Dr. Chavez noted a diagnosis of osteoarthritis in both knees, and in July 2009, the claimant complained she was unable to walk due to her knee; on both occasions Dr. Chavez noted no deficits in extremity range of motion, strength, or tone (Exhibits 2F, 4F, 8F, and 13F). Between September 11, 2008, and December 31, 2009, Dr. Chavez's progress notes document only the March and July 2009 musculoskeletal complaints.
>
> The claimant has been treated by Dr. Kaushal K. Sinha, orthopedics, intermittently since January 2007, when she broke her ankle. The claimant returned in September 2008 complaining of a two week history of bilateral knee pain. The clinical examination and radiographic studies resulted in the diagnoses of chronic low back pain syndrome secondary to degenerative disc process and possible thoracolumbar left scoliosis and bilateral advanced tricompartmental degenerative arthritis of the knees. Dr. Sinha advised the claimant to diet, lose weight, and exercise. He specifically noted swimming, bicycling in a sitting position, and William flexion exercises. He advised her to continue with the Diclofenac prescribed by Dr. Chavez and also prescribed Vicodin with one refill. In October 2008, the claimant returned with continued back and right knee problems. She was again advised to lose weight. A limited bone scan was recommended but apparently not performed. The claimant did not return to Dr. Sinha until August 2010 (consistent with the claimant's statements of deterioration during 2010). The claimant reported pain in her right heel, left knee, and back; it was getting worse (Exhibit 12F).

[R. 17–18.]

41

In light of the above, and in light of the fact that none of Plaintiff's physicians imposed restrictions on her activities, or opined that she was disabled or unable to perform work, and recommended that she exercise, the ALJ determined Plaintiff retained the RFC for light work with additional postural limitations. [*See* R. 19–21.]

### Discussion

As an initial matter, Plaintiff's contention that the ALJ's decision does not comply with SSR 86-8 is misplaced.  SSR 86-8 provides that

> When [an] individual's impairment or combination of impairments meets or equals the level of severity described in the Listing, and also meets the duration requirement, disability will be found on the basis of the medical facts alone in the absence of evidence to the contrary (e.g., the actual performance of SGA, or failure to follow prescribed treatment without a justifiable reason).

Plaintiff does not contend, however, that the ALJ failed to make a proper Listing analysis; nor does the Plaintiff contend that she meets any of the Listings.  Plaintiff merely takes issue with the ALJ's decision not to relate evidence outside of the relevant time period back to the relevant time period in determining Plaintiff's limitations.

As stated above, the Court has already determined that the Plaintiff has failed to present evidence linking the medical evidence produced after the DLI to the relevant time period; thus, the ALJ was not required to consider that evidence in determining Plaintiff's RFC. Furthermore, Plaintiff failed to explain why, considering such later produced evidence, would prevent Plaintiff from performing light work.

In assessing RFC, the ALJ must consider limitations and restrictions imposed by all of a claimant's impairments, including those that are not severe.  SSR 96-8p, 61 Fed. Reg. 34,474–01, at  34,477 (July 2, 1996).  The ALJ must consider all relevant evidence in the

record, including medical history, medical signs, laboratory findings, lay evidence, and medical source statements.  *Id.* at 34,477.  SSR 96-8p specifically states, "[t]he RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted."  *Id.* at 34,478.

Upon review, the Court finds that the ALJ clearly considered the evidence of record and determined that "[t]he weight of the evidence convincingly showed deterioration after the date the claimant's disability insurance coverage expired, and the deterioration cannot be reasonably related back to the period under consideration."  [R. 21.]  Plaintiff provided no medical opinion or reasonable basis on which the Court could determine that the medical evidence produced after Plaintiff's DLI related back to the relevant time period; thus, no further fact finding by the ALJ was necessary.  *See e.g., Manning v. Colvin*, C/A No. 8:12-1478-DCN-JDA, 2014 WL 1315228, at *19 n.8 (D.S.C. March 30, 2014)(records dated a minimum of eight months after Plaintiff's DLI and the physician opinion letter dated 28 months after the DLI, with no specific statement that the opinion relates back to the relevant time period, is a sufficient basis to conclude no further fact finding is necessary).

The Court finds the ALJ considered all relevant evidence in the record, including medical history, medical signs, laboratory findings, lay evidence, and medical source statements during the relevant time period.  The ALJ's decision is also sufficiently explained so as to allow the Court to track the ALJ's reasoning and be assured that all record evidence was considered and understand how the ALJ resolved conflicts in the evidence.  *See McElveen v. Colvin*, C/A No. 8:12-1340-TLW-JDA, 2013 WL 4522899, at *11 (D.S.C. Aug. 26, 2013).  Additionally, the Court finds the ALJ properly declined to consider Dr.

43

Chavez's opinion letter regarding Plaintiff's limitations, dated almost 20 months after Plaintiff's DLI, as it contained no specific statement that the opinion related back to the relevant time period.  For these reasons, the Court finds the ALJ's determination is supported by substantial evidence and declines to remand on this basis.

## CONCLUSION AND RECOMMENDATION

Wherefore, based upon the foregoing, the Court recommends that the Commissioner's decision be AFFIRMED.

IT IS SO RECOMMENDED.

July 7 , 2014                                        s/Jacquelyn D. Austin
Greenville, South Carolina              United States Magistrate Judge